**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| Ashley Nelsen, Roody Jasmin, and Joellyn Williams, individually and as representatives of a class of similarly situated persons, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | **CLASS ACTION** |
| Principal Global Investors Trust Company, Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company, Principal Global Investors, LLC, and Principal Management Corporation, | |
| Defendants. | |

## NATURE OF THE ACTION

1.     Plaintiffs Ashley Nelsen, Roody Jasmin, and Joellyn Williams ("Plaintiffs"), individually and as representatives of the Class described herein, bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Principal Global Investors Trust Company, Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company, Principal Management Corporation, and Principal Global Investors, LLC (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties with respect to their disloyal and imprudent management of the Principal LifeTime Hybrid Collective Investment Funds ("Principal CITs") in violation of ERISA, to the detriment of participant investors. Plaintiffs bring this action to recover the losses caused by Defendants' fiduciary breaches, disgorge the profits earned by Defendants and their affiliates as a result of these breaches, prevent further mismanagement of the Principal CITs, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.     Launched in 2009, the Principal CITs are a series of target-date funds maintained as collective investment trusts. Collective investment trusts are pooled investment vehicles maintained by a bank or trust company available exclusively to retirement plan customers. A collective investment trust is managed and operated in accordance with that trust's governing documents, which in this case included a Declaration of Trust and the participation agreement signed by each participating retirement plan.

3.     Though collective investment trusts generally offer many of the same features as mutual funds—pooling of investors' assets, centralized investment management, daily liquidity, unitization, and valuation of units at net asset value of the underlying assets—collective investment trusts are regulated differently than mutual funds in two important respects. First, collective investment trusts are exempt from registration under the Investment Company Act of 1940, and therefore are not subject to the reporting and organizational requirements of the '40 Act or the accompanying SEC oversight. Second, while ERISA explicitly excludes mutual fund managers from the definition of a fiduciary, 29 U.S.C. § 1002(21)(b), to the extent they are managing assets of a plan covered by ERISA, the trustees (and any sub-advisers they employ) of collective investment trusts are ERISA fiduciaries, DOL Advisory Opinion 2005-09A, and must adhere to the duties of loyalty and prudence, respectively, requiring them to act "solely in the interest of the participants and beneficiaries" and "[w]ith the care, skill, prudence, and diligence" that a similarly-situated prudent person would employ. 29 U.S.C. § 1104(a). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

4.     The Principal CITs are target-date funds. A target date fund is a diversified investment providing exposure to a variety of asset classes, comprised mostly of equity and fixed income securities, with an investment mix that becomes more conservative as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date. As of the end of 2017, the Principal CITs[1] consisted of twelve trusts: eleven options with a target date ranging from 2010 to 2060 (2010, 2015, 2020, etc.), and an option called Principal LifeTime Hybrid Income Fund designed for investors "who have reached their investment time horizon."[2]

5.     The Principal CITs have at all relevant times been managed using a fund-of-funds structure, meaning that the CITs' assets are invested in other pooled investment products, which according to the Declaration of Trust can be mutual funds, collective investment trusts, and annuity separate accounts, among other options.[3] Through the end of 2017, the fees of each Principal CIT consisted of four components: (a) a trustee fee of .04%, set by the Declaration of Trust; (b) operating expenses, which are deducted from the trust; (c) the service fee, which varies based upon the share class selected in the participation agreement, and ranges from 0 bps to 110

---

[1] As of the end of 2017, the full legal name of the twelve Principal CITs was: Principal LifeTime Hybrid 2010 CIT; Principal LifeTime Hybrid 2015 CIT, Principal LifeTime Hybrid 2020 CIT, Principal LifeTime Hybrid 2025 CIT . . . Principal LifeTime Hybrid 2060 CIT, and Principal LifeTime Hybrid Income CIT.  Declaration of Trust & Supplements (Mar. 10, 2017), attached as **Exhibit A**. Prior to January 1, 2017, the Principal CITs were named Principal Trust[SM] Target 2010 Fund, Principal Trust[SM] Target 2015 Fund, etc.

[2] Principal LifeTime Hybrid Income CIT Fact Sheet at 1 (as of Dec. 31, 2017), available at https://secure05.principal.com/document-download/api/v1/public/document?format=VOP&itemId=FS1TIF97 (last accessed Feb. 1, 2018).

[3] Declaration of Trust § 3.1(e)–(g).

bps; and (d) the "fees charged by the underlying investments in the [Principal CIT]."[4] The first, second, and fourth fee components were the same for all investors in a particular Principal CIT, while the service fee varied depending upon the share class selected by the participating plan.

6. Because the Principal CIT investors bear the expense of the underlying investment options, Defendants' decisions regarding which underlying investment options to use directly determined the amount of fees paid by Principal CIT investors as well as the recipient of those fees.

7. Defendants in this case include the current and former trustee of the Principal CITs, and the current and former investment adviser of the Principal CITs. Under the Declaration of Trust, the trustee and investment adviser were jointly responsible for determining the asset allocation of the Principal CITs as well as selecting the specific funds used to achieve each Principal CIT's target asset allocation. As Defendants acknowledged in both the Declaration of Trust and sales literature for the Principal CITs, they were all fiduciaries with respect to the management of the Principal CITs, and their fiduciary duties included the selection and monitoring of investment options and investment managers.[5]

8. The Principal CITs' investment process is described in their sales literature.[6] First, Defendants determined which asset classes would make up the CITs. Second, Defendants

---

[4] Declaration of Trust & Supplements (there is a separate supplement for each Principal CIT; each supplement contains the quoted language, but names the particular Principal CIT).

[5] Principal LifeTime Hybrid CITs brochure at 6 (Jan. 2018), available at https://secure02.principal.com/publicvsupply/GetFile?fm=PQ8820&ty=VOP&EXT=.VOP (hereinafter "2018 Brochure") (last accessed Feb. 1, 2018); Declaration of Trust §§ 3.3, 3.5.

[6] *See, e.g.*, 2018 Brochure at 6; Principal Trust[SM] Target Date Collective Investment Funds brochure at 4 (May 2014), available at https://www.principal.com/allweb/docs/ris/investments/profile/1/pj_1052.pdf (hereinafter "2014 Brochure") (last accessed Feb. 1, 2018).

determined the percentage allocations to each of these asset classes throughout the investor's investment lifespan. This gradually-shifting asset allocation is known as the "glide path" for a series of target date funds. Third, Defendants constructed each Principal CIT's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers."[7] Defendants' fiduciary breaches in this case relate entirely to this third step—the selection and monitoring of the Principal CITs' underlying investment options.

9.      As part of this third step, Defendants determined that four asset classes should be represented through passively-managed investment portfolios, commonly known as "index funds": (1) large company domestic equities ("large cap stocks") would be represented by an index fund tracking the Standard & Poor's 500 Index ("S&P 500 Index"); (2) fixed income securities ("bonds") would be represented by an index fund tracking the Bloomberg Barclays Aggregate Bond Index; (3) midsize company domestic equities ("mid cap stocks") would be represented by an index fund tracking the S&P MidCap 400; and (4) small company domestic equities ("small cap stocks") would be represented by an index fund tracking the S&P SmallCap 600 Index. Throughout the relevant period, Defendants have used index funds tracking these specific indices to provide exposure to these four asset classes, and at all relevant times these four index funds have represented 60 to 70 percent of the total assets of each of the Principal CITs.

10.     Plaintiffs do not challenge either the decision to use passive investments for these four asset classes or the index used to represent each asset class. Defendants' fiduciary breaches

---

[7] 2014 Brochure at 4.

relate to *which* index funds they utilized to track each of these four indices, a determination that fell squarely within the scope of their fiduciary duties.

11.    The marketplace for index funds is highly competitive. For most major market indices, one or more companies offer an index fund product that can track the index with a high degree of accuracy, while charging very low fees. This is particularly true for large investors such as the Principal CITs (which at all relevant times had over two billion dollars invested in index fund investments), that can leverage their billions in investable assets to negotiate lower fees than what is available to the vast majority of investors.

12.    Defendants did not invest in any of the competitive index fund offerings in the marketplace, choosing instead to profit themselves and their affiliates by investing exclusively in Principal's proprietary index funds, despite fees that were 5 to 15 times higher than marketplace alternatives that tracked the ***exact same index***. Not only were the Principal index fund products far more expensive, they were also of significantly lower quality. Compared to marketplace alternatives, Principal's index funds deviated further from the benchmark index, and consistently had the worst performance even on a pre-fee basis.

13.    Given the high fees and history of poor performance of Principal's index funds, a prudent fiduciary of a multi-billion dollar suite of target date funds acting in the best interest of the trust beneficiaries would have removed these proprietary index funds from the Principal CITs at the beginning of the relevant period and replaced them with more competitive marketplace alternatives. Defendants' failure to do so has cost participants millions in investment losses compared to what they would have earned had Defendants acted in accordance with their fiduciary duties.

14.     Defendants' failure to exercise the level of prudence and loyalty expected under the circumstances is best illustrated by contrasting their conduct to that of other, similarly-situated fiduciaries. Fiduciaries of numerous other target-date collective investment trusts offered by companies such as Charles Schwab, JPMorgan, AllianceBernstein, and Great-West all invested in non-proprietary index funds as underlying holdings, despite the fact that each of these financial services companies offers their own indexing products or services in the marketplace. No fiduciaries of other target-date collective investment trusts (outside of fiduciaries affiliated with Principal) used Principal's index funds as underlying holdings.

15.     Defendants' failure to prudently and loyally manage the underlying investments of the Principal CITs was not limited to index fund selection. Defendants also intentionally selected higher-fee versions of proprietary actively-managed funds to increase fee revenue, at the expense of trust participants and beneficiaries. Under the Declaration of Trust, Defendants were permitted to invest in collective investment trusts, mutual funds, annuity separate accounts, and other vehicles.[8] For many of the Principal-affiliated investments selected by Defendants, Principal offered both mutual fund and annuity separate account versions. Each of these vehicles contained identical investments, but varied significantly in terms of costs. Principal also offered different share classes of each of these different vehicles, with the primary difference being the costs associated with each share class.

16.     Investment in the lowest-cost share class generally requires the investor to meet a minimum investment requirement. These minimums were easily met in this case. While many investors might have been constrained as to which vehicle or share class they could own due to

---

[8] Declaration of Trust § 3.1(e)–(g).

contractual limitations, regulatory constraints, or a limited asset base, Defendants did not face any of these constraints in managing the Principal CITs given the asset base of the Principal CITs, the resulting negotiating power, and the language within the Declaration of Trust permitting ownership of various vehicles.

17.    As a fiduciary, Defendants "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical— other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016). Yet Defendants did exactly that by intentionally selecting more expensive vehicles and share classes, not because of any benefit they conferred upon participants, but because of the additional fees Defendants and their affiliates received from these more expensive options.

18.    For example, throughout the statutory period, the Principal CITs have had more than $1 billion invested in Institutional shares of the Principal Diversified International mutual fund, which charged annual expenses of 0.85% as of the end of 2017. Yet Defendants could have instead selected the exact same investment in annuity separate account form, the lowest-cost share class of which charged fees of only 0.39% per year.

19.    The Principal CITs had sufficient assets to qualify for the lowest-cost share class of the Diversified International annuity separate account, given that numerous investors with less investable assets (including Principal's own retirement plan) were invested in it. The Principal CITs derived no benefit from the more expensive mutual fund version; the investment holdings were identical, and the protections of the '40 Act were not necessary for institutional investors such as Defendants, especially given their affiliation with the managers of both vehicles.

20.    Defendants' pattern of failing to leverage the assets and negotiating power of the Principal CITs to demand the lowest-cost vehicle and share class was not limited to the Diversified International Fund—for eleven of the thirteen investments held by the Principal CITs, Defendants failed to use the least expensive vehicle, failed to use the least expensive share class, or both. And in each of these eleven cases, the result was higher fees to Defendants and their affiliates, and lower returns for participants.

21.    These imprudent investment decisions were not the result of mere negligence or oversight. To the contrary, Defendants consistently invested the assets of the Principal CITs in costly and underperforming index funds, vehicles, and share classes, and failed to timely remove those funds long after a reasonable investigation would have revealed the availability of lower cost, better performing options. Defendants' wrongdoing consistently earned themselves and their Principal affiliates additional investment management fees and provided a larger asset base to make Principal's index fund and mutual fund products more competitive in the marketplace. By managing the Principal CITs in this fashion, Defendants have breached their fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

## JURISDICTION AND VENUE

22.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provides a private right of action to retirement plan participants to remedy breaches of fiduciary duties under ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

23.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

24.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the breaches of fiduciary duties giving rise to this action occurred, and where all Defendants may be found.

## THE PARTIES

### PLAINTIFFS

25.     Plaintiff Ashley Nelsen ("Nelsen") resides in Eden Prairie, Minnesota, and is a current participant in the Starkey Laboratories, Inc. Employee Retirement Plan. Through that plan, Nelsen has been invested in the Principal LifeTime Hybrid 2055 CIT from approximately 2016 to the present. During that time, over sixty percent of the assets in the 2055 Principal CIT have been invested in the four imprudent Principal-affiliated index funds identified herein, the Principal Diversified International mutual fund, and multiple other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Had Defendants prudently and loyally managed the Principal CITs, Nelsen would have more assets in her plan account, and therefore she has been injured by Defendants' unlawful conduct. Furthermore, Defendants have been unjustly enriched as a result of Nelsen's investment in the Principal CITs.

26.     Plaintiff Roody Jasmin ("Jasmin") resides in Douglasville, Georgia, and is a current participant in the Fleetcor Technologies, Inc. 401(k) Savings Plan. Through his participation in that plan, Jasmin has been invested in the Principal LifeTime Hybrid 2040 CIT from approximately 2015 to the present. During that time, over sixty percent of the assets in the 2040 Principal CIT have been invested in the four Principal-affiliated index funds identified herein, the Principal Diversified International mutual fund, and multiple other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Had Defendants not violated their fiduciary duties in their management of the Principal CITs, Jasmin would currently

have more assets in his plan account, and therefore he has been injured by Defendants' unlawful conduct. Furthermore, Defendants have been unjustly enriched as a result of Jasmin's investment in the Principal CITs.

27.    Plaintiff Joellyn Williams ("Williams") resides in McDonough, Georgia and is a participant in the Fleetcor Technologies, Inc. 401(k) Savings Plan. Through her participation in that plan, Williams has been invested in the Principal LifeTime Hybrid 2025 CIT from approximately 2015 to the present. During that time, over sixty percent of the assets in the 2025 Principal CIT have been invested in the four Principal-affiliated index funds identified herein, the Principal Diversified International mutual fund, and multiple other investments for which Defendants failed to obtain the lowest-cost vehicle or share class. Had Defendants not violated their fiduciary duties in their management of the Principal CITs, Williams would currently have more assets in her plan account, and therefore she has been injured by Defendants' unlawful conduct. Furthermore, Defendants have been unjustly enriched as a result of Williams' investment in the Principal CITs.

**DEFENDANTS**

***PGI Trust***

28.    Defendant Principal Global Investors Trust ("PGI Trust") has been the trustee of the Principal CITs since January 1, 2017. PGI Trust is an Oregon corporation but is located in Des Moines, Iowa. PGI Trust was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

29.    Under the Declaration of Trust, PGI Trust had primary responsibility for managing the assets of the Principal CITs, including the selection and monitoring of investment managers to manage the assets of the Principal CITs. *See* Declaration of Trust § 3.2. PGI Trust

warrants in the Declaration of Trust that it is a fiduciary as to the management and control of the assets of the Principal CITs. *Id.* §§ 3.3, 3.5. PGI Trust makes similar representations in sales literature.[9] PGI Trust also acknowledges in each participation agreement that it is a fiduciary with respect to any plan assets invested in the Principal CITs. Though PGI Trust had the authority to (and did) hire an investment adviser to render advice regarding management of the Principal CITs, under the Declaration of Trust, PGI Trust was responsible for establishing the guidelines, policies, and procedures to be followed by such adviser, and retained ultimate authority over the management of the assets of the Principal CITs. *Id.* § 3.3. PGI Trust also received direct and indirect compensation for rendering investment advice with respect to the management of the Principal CITs.

30.     Because it is identified in the Declaration of Trust and participation agreements as a fiduciary of each plan as to the assets invested in the Principal CITs, PGI Trust qualifies as an "investment manager" as defined by 29 U.S.C. § 1002(38), and as such is a named fiduciary pursuant to 29 U.S.C. § 1102(c)(3). Further, PGI Trust is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority and control with respect to the management or disposition of plan assets, and because it renders investment advice for a fee or other compensation with respect to plan assets.

---

[9] *See* Principal DOL Fiduciary Regulatory Package Q&A for Plan Sponsors at 2 (Mar. 2017) ("If you purchased an interest in Principal Lifetime Hybrid Collective Investment Funds, Principal Global Investors Trust Company is an ERISA fiduciary with respect to assets held in the Target Date Funds.") available at https://secure02.principal.com/publicvsupply/GetFile?fm=PQ12238G&ty=VOP&EXT=.VOP&it emtype=4 (last accessed Mar. 30, 2018); 2018 Brochure at 6 (stating that the Principal CIT managers' fiduciary duties include "the selection and monitoring of investment managers for . . . the Principal LifeTime Hybrid CITs").

***Principal Trust***

31.     Defendant Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company ("Principal Trust") was the trustee of the Principal CITs from their 2009 inception through the end of 2016. Principal Trust is a Delaware corporation but at all relevant times was located in Des Moines, Iowa. Principal Trust was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

32.     Under the Declaration of Trust in effect through the end of 2016, Principal Trust had primary responsibility for managing the assets of the Principal CITs, including the selection and monitoring of investment managers. Pre-2017 versions of the Declaration of Trust identified Principal Trust as the fiduciary of the Principal CITs. Principal Trust also acknowledged in each participation agreement that it is a fiduciary with respect to any plan assets invested in the Principal CITs. Pre-2017 sales literature for the Principal CITs acknowledged that "Principal Trust has discretion over the investment of the Collective Investment Funds" and that "Principal Trust and PMC are fiduciaries subject to the Employee Retirement Income Security Act of 1974, as amended."[10] Though Principal Trust had the authority to (and did) hire an investment adviser to render advice regarding management of the Principal CITs, under the Declaration of Trust, Principal Trust was responsible for establishing the guidelines, policies, and procedures to be followed by such adviser, and retained ultimate authority over the management of the assets of the Principal CITs. Principal Trust also received direct and indirect compensation for rendering investment advice with respect to the management of the Principal CITs.

---

[10] 2014 Brochure at 1, 7.

33.    Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal CITs, Principal Trust qualifies as an "investment manager" as defined by 29 U.S.C. § 1002(38), and is thus a named fiduciary for every participating plan pursuant to 29 U.S.C. § 1102(c)(3). Further, Principal Trust is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

*PGI*

34.    Defendant Principal Global Investors, LLC ("PGI") is a registered investment adviser and has acted as the investment adviser of the Principal CITs from approximately January 2017 to the present. PGI is a Delaware corporation, but at all relevant times was located in Des Moines, Iowa. PGI was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

35.    Pursuant to an agreement with PGI Trust, from approximately January 2017 to the present, PGI has served as investment adviser to the Principal CITs, subject to the supervision and review of PGI Trust. In this capacity, PGI shared responsibility with PGI Trust for the asset allocation of each Principal CIT, and the selection and monitoring of the individual investments held by each Principal CIT. The Declaration of Trust provides that any investment adviser appointed by PGI Trust would serve as a co-fiduciary of the Principal CITs. *See* Declaration of Trust § 3.3. Under PGI's agreement with PGI Trust, PGI acknowledged that by serving as investment manager of the Principal CITs, it would be acting in a fiduciary capacity as to the management of the Principal CITs' assets. PGI received a fee for the services it performed for the Principal CITs. PGI also served as the portfolio manager for the large majority of the

underlying investments held by the Principal CITs, and received management fees from those portfolios.

36.    Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal CITs, and acknowledged its fiduciary role in its agreement with PGI Trust, PGI qualifies as an "investment manager" under 29 U.S.C. § 1002(38), and is thus a named fiduciary for every plan with assets invested in the Principal CITs pursuant to 29 U.S.C. § 1102(c)(3). Further, PGI is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

*PMC*

37.    Defendant Principal Management Corporation ("PMC") is a registered investment adviser and acted as the investment adviser of the Principal CITs from their 2009 inception until approximately the end of 2016. PMC is an Iowa corporation, and at all relevant times was located in Des Moines, Iowa. PMC was at all relevant times a subsidiary of Principal Financial Group, Inc.

38.    Pursuant to an agreement with Principal Trust, from 2009 to 2016, PMC served as investment adviser to the Principal CITs, subject to the supervision and review of Principal Trust. In this capacity, PMC shared responsibility with Principal Trust for the asset allocation of each Principal CIT, and the selection and monitoring of the individual investments held by each Principal CIT. The operative Declaration of Trust provided that any investment adviser appointed by Principal Trust would serve as a co-fiduciary of the Principal CITs. Under PMC's agreement with Principal Trust, PMC acknowledged that by serving as investment manager of

the Principal CITs, it would be acting in a fiduciary capacity as to the management of the Principal CITs' assets. PMC received a fee for the services it performed for the Principal CITs. PMC also served as the portfolio manager for the large majority of the underlying investments held by the Principal CITs, and received management fees from those portfolios. Pre-2017 sales literature for the Principal CITs stated, "Principal Trust and PMC are fiduciaries subject to the Employee Retirement Income Security Act of 1974, as amended."[11]

39.     Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal CITs, and acknowledged its fiduciary role in its agreement with Principal Trust, PMC qualifies as an "investment manager" under 29 U.S.C. § 1002(38), and is thus a named fiduciary for every plan with assets invested in the Principal CITs pursuant to 29 U.S.C. § 1102(c)(3). Further, PMC is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

40.     Each of the four Defendants identified above is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

---

[11] 2014 Brochure at 1, 7.

## LEGAL AND FACTUAL BACKGROUND

### COLLECTIVE INVESTMENT TRUSTS

41.     A collective investment trust ("CIT") is a pooled investment vehicle maintained by a bank or trust company that is available exclusively to qualified retirement plans exempt from federal income tax including 401(k) plans and certain government plans. CITs are generally organized under a Declaration of Trust. Each plan that invests in the CIT enters into a participation agreement with the CIT and its trustee.

42.     Like a mutual fund, a CIT is a pooled investment fund managed by an investment professional according to a defined investment objective. CITs can hold a wide range of securities, including stocks, bonds, options, exchange-traded funds, mutual funds, annuity separate accounts, and even other CITs. A CIT utilizes a unitized structure, with each share, or unit, representing a proportionate, undivided interest in the CIT that shares proportionately in the income, profits, and losses experienced by the entire pool of assets within the CIT.

43.     CITs generally have an investment minimum of several million dollars. Furthermore, most CITs offer different share classes, and only make the lowest cost share class available to investors with hundreds of millions of dollars to invest. Thus, CITs are particularly suitable for large, institutional investors.

44.     CITs have evolved, and many now provide similar features to mutual funds including daily valuation, automated daily processing, fact sheets, standardized performance and expense disclosures. These features are often contractual—each investor in the CIT has a contractual relationship with the trustee—and will often provide the same protections in contract form that mutual fund investors are provided by the '40 Act.

45.     While CITs might have many of the same features of mutual funds, unlike mutual

17

funds, CITs are not covered by the Investment Company Act of 1940, and likewise are not subject to the SEC registration, regulatory, and oversight requirements provided by the '40 Act.

46.     CITs differ from mutual funds in another critical respect—under ERISA, mutual fund managers are excluded from the definition of a "fiduciary", such that an ERISA plan's investment in a mutual fund registered under the Investment Company Act of 1940 "shall not by itself cause such investment company or such investment company's investment adviser . . . to be deemed to be a fiduciary . . . ." 29 U.S.C. § 1002(21)(B).

47.     However, no such exception exists for the managers of collective investment trusts. Therefore, the trustee of a CIT is an ERISA fiduciary to the extent that the assets of an ERISA-covered plan are invested in the CIT. DOL Advisory Opinion 2005-09A (May 11, 2005) (explaining that the manager of a CIT "is a fiduciary under section 3(21) of ERISA with respect to ERISA-covered plans for which it serves as a trustee"), available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/2005-09a. As the 1974 ERISA Conference Committee Report explained, "banks, trust companies, and insurance companies [that] maintain pooled investment funds for plans . . . are, of course, plan fiduciaries" who must manage the funds "for the exclusive benefit of participants and beneficiaries." H.R. Report 93-1280, 93rd Congress, 2nd. Sess., at 316, 1974 WL 324168, at *61 (1974). The SEC concurs, explaining that "any person who exercises authority or control respecting the management or disposition of the underlying assets of the collective trust fund . . . and anyone providing investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the plan" who is "subject to all of the duties and liabilities imposed upon plan fiduciaries" by ERISA. Securities and Exchange Commission Division of Investment Management, Staff Guidance and Studies, 1992 WL 12623680, at *96 (1992).

48.    Accordingly, in making investment decisions, the trustee of a CIT "and any sub-advisers it may employ" must "manage each CIT under ERISA fiduciary standards to the extent ERISA assets are invested in the CIT." Coalition of Collective Trusts, White Paper on Collective Investment Trusts at 10 (2015), available at https://www.ctfcoalition.com/portalresource/CollectiveInvestmentTrustsWhitePaper.pdf (last accessed Apr. 13, 2018).[12] These standards require CIT managers "to act solely in the interests of plan participants and their beneficiaries . . . avoiding conflicts of interest such as making decisions that may be in the [trustee]'s best interests." *Id.* at 10.

### TARGET DATE FUNDS AND THE FUND-OF-FUNDS STRUCTURE

49.    A target date fund invests in a diversified mix of asset classes managed towards a particular target (retirement) date, or the approximate date when the investor expects to start withdrawing money from the fund. For example, the Principal LifeTime Hybrid 2030 Fund is designed for an investor who expects to retire around 2030. As the target date approaches, the investment mix becomes more conservative, typically by shifting away from stock investments towards more conservative fixed income investments. However, target date funds are not limited to stocks and bonds, and often use asset classes such as commodities, real estate, inflation-linked bonds, or emerging markets stocks. A target date fund's asset allocation over the lifespan of the investment is called its "glide path". Investment companies offer target date funds as a suite, meaning that they offer funds with an array of target dates staggered either 5 or 10 years apart, along with an "income" or "retirement" fund for investors who have already retired.

---

[12] Defendants PGI Trust and Principal Trust are both members of the Coalition of Collective Investment Trusts. *See* Coalition of Collective Investment Trust website (listing PGI Trust and Principal Trust as "Coalition Members"), available at https://www.ctfcoalition.com/Coalition-Members (last accessed Apr. 13, 2018).

50.    To accomplish the target asset allocation and diversification across numerous asset classes, the vast majority of target-date funds use a "fund-of-funds" structure, in which the target-date fund invests its assets in other pooled investment products.  For target-date mutual funds, these pooled investment products typically include other mutual funds or exchange-traded funds. For target-date CITs, the pooled investment product holdings often include other collective investment trusts, annuity separate accounts, mutual funds, and exchange-traded funds.

### MARKETPLACE FOR INDEX FUNDS IN RETIREMENT PLAN INVESTMENTS

51.    An index fund is a passively-managed, pooled investment product designed to mirror the performance of a particular benchmark index.  For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly-traded companies in the United States. The marketplace for index funds has evolved such that for asset classes such as large cap stocks, small cap stocks, foreign stocks, and domestic bonds, there are generally dozens of different products available that track a benchmark index that tracks the particular asset class. These products are not limited to the best-known index associated with the asset class. For example, not only are there numerous products that track the S&P 500, there are also numerous products that track the Russell 1000, another index that tracks large-cap domestic stocks. Regardless of the benchmark index that an investor wants to track, there will generally be several products in the marketplace from which to choose.

52.    The marketplace for index funds is also highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision, while charging very low fees.

53.    The competitiveness of the marketplace for index funds is particularly acute within the retirement plan segment, given that retirement plan investors have the unique ability

to invest in collective investment trust vehicles, which generally have lower expenses than comparable mutual funds.

54.    Over the past ten years, multiple investment management companies have distinguished themselves in the marketplace by offering highly competitive index fund products based on several competitive advantages: a high degree of institutional expertise at indexing, sophisticated trading platforms that minimize trading costs, and a large asset base that provides economies of scale. As a result, these companies—which include BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard—have captured a very large percentage of market share of passively-managed assets among large plans and investors in the retirement plan segment.[13]

55.    Though the marketplace for index funds is very competitive, that does not mean that the offerings are uniformly competitive. Some index funds charge fees that are 5, 10, or even 20 times higher than those charged by another fund tracking the exact same index. Furthermore, a higher level of fees does not in any way correspond to a higher quality product or higher level of services. On the contrary, the least expensive offerings often have the lowest level of tracking error, meaning that they track the index with the highest level of precision.

56.    The Restatement of Trusts makes note of the competitive and variant nature of the marketplace for investment products, emphasizing that prudent fiduciaries must be aware of the

---

[13] Fidelity is also relatively competitive in the index fund marketplace, but limits the distribution of its index funds to retirement plans for which Fidelity is the recordkeeper and Fidelity's own fund-of-fund offerings. In contrast, BlackRock, BNY Mellon, Northern Trust, State Street and Vanguard actively market their index fund products to other, unaffiliated managers. *See Terraza v. Safeway*, No. 3:16-cv-03994-JST, Dkt. No. 84-19 (N.D. Cal. June 22, 2017) (report from Aon Hewitt reviewing available marketplace offerings for Safeway plan, listing BlackRock, Vanguard, State Street, Northern Trust, and BNY Mellon as the "top 5 index managers").

"availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs." Restatement (Third) of Trusts ch. 17, intro. note (2007). A fiduciary therefore "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc); *see also Moreno v. Deutsche Bank Americas Holding Corp.*, 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (offering "proprietary index funds … [that] charged fees that were excessive compared with similar investment products" supported breach of fiduciary duty claim); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) ("fail[ure] to investigate lower-cost options with comparable performances" supported breach of fiduciary duty claim).

57.     Once a fiduciary has identified a particular market index that it seeks to track, a prudent fiduciary primarily considers three interrelating factors when choosing which index fund to use to  track the chosen index. The first factor is costs. Because an index fund, all things being equal, will produce returns equal to the performance of its benchmark index minus the fees charged by the index fund, fees are a significant determinant of index fund performance.[14]

---

[14] *See* Wilshire Associates Report to Los Angeles City Employees' Retirement System, at 7 (June 26, 2012) (assigning 75% weight to "fees" criteria in search for index fund managers), available at https://www.lacers.org/aboutlacers/board/BoardDocs/2012/Board/20120626/ITEM%20IV-C%20%20INVESTMENTS%20-%20SELECTION%20OF%20INVESTMENT%20MANAGERS%20FOR%20MULTIPLE%20PASSIVE%20INVESTMENT%20MANDATES.pdf (last accessed Apr. 13, 2018) (hereinafter "Wilshire Index Fund Report"); Russel Kinnel, *Fund Fees Predict Future Success or Failure*, at 1 (summarizing multiple studies showing that fees are primary determinant of performance),

58.    The second factor to consider in evaluating index funds is tracking error, which measures how far the index fund's return has historically deviated from the return of the benchmark index.[15] Tracking error does not look to whether the deviation is negative or positive, because either type of variance demonstrates that the index fund's investments did not produce a return that mirrored that of the index, which is the fund's objective.

59.    As an aspect of measuring tracking error, prudent fiduciaries pay particular attention to negative tracking error, meaning index fund performance that trails the underlying index.[16] Prudent fiduciaries will pay particular attention to negative tracking error because while some sources of tracking error relate to tracking failure, and can result in either outperformance or underperformance, some causes of tracking error—cash drag, inefficient trading systems, and illiquidity—have a generally negative effect on performance.[17] Because chronically negative performance is worse than merely random performance, prudent fiduciaries will seek to avoid

---

available at http://www.morningstar.com/articles/752485/fund-fees-predict-future-success-or-failure.html (last accessed Apr. 13, 2018); Jim Mitchell, *Investors Should Choose Index Funds with the Lowest Fees*, TheStreet (Mar. 10, 2015), available at https://www.thestreet.com/story/13072023/1/investors-should-choose-index-funds-with-the-lowest-fees.html (last accessed Apr. 13, 2018).

[15] Los Angeles Deferred Compensation Plan Board Minutes from February 6, 2015 meeting, at 2–3 (summarizing Mercer Investment Consulting passive manager search and noting that the most notable criteria in assessing passive managers are how closely the fund tracks the target index and the level of fees charged to participants), available at http://per.lacity.org/deferredcomp/BoardReport15-10PassiveSearchRecommendations.pdf (last accessed Apr. 13, 2018); Wilshire Index Fund Report at 7 (assigning 25% weight to "tracking error" criteria in passive manager search).

[16] *See, e.g.*, Mercer Index Fund Report at 27–31 (tracking historical performance separate from tracking error).

[17] BlackRock Index Fund Presentation to Los Angeles City Employees' Retirement System, at 21 (Aug. 8, 2017), available at http://www.lacers.org/aboutlacers/board/BoardDocs/2017/Investment/2017-08-08/IV%20-%20Presentation%20Blackrock%20re%20Multi%20Passive%20Index%20Portfolios.pdf (last accessed Apr. 13, 2018) (hereinafter "BlackRock Index Fund Report")

index funds that consistently underperform their index on a pre-fee basis, as it will tend to indicate a manager plagued by cash drag, inefficient trading, or illiquidity. Further, because issues with trading efficiency, cash drag, and illiquidity all relate to the amount of assets within the index fund and the skill of the managers, they tend to replicate over time, and thus are often predictive of future underperformance.

60.    The third factor that prudent fiduciaries will consider in selecting an index fund are institutional experience and expertise. As explained by EnnisKnupp, the investment consultant to Illinois' State Universities Retirement System, "Years of indexing experience and passive assets under management are important metrics to review when looking at passive managers. Firms with large amounts of passive assets under management are able to leverage their size and scale to more closely track the benchmark. In addition, firms that have multiple indexed products tend to show more commitment (e.g., engage in a greater effort to minimize trading costs) than firms for which indexing is a small part of their business."[18] Thus, in assessing a particular index strategy, a prudent fiduciary will look at each manager's experience managing the particular strategy and the amount of assets managed according to that strategy, but also broader factors such as the manager's overall experience with index investing and its

---

[18] Hewitt EnnisKnupp Report to Illinois State Universities Retirement System Board of Trustees at 3 (May 27, 2010), available at http://www.surs.com/pdfs/minutes/x_inv/ex_06_08_a.pdf (last accessed Apr. 13, 2018) (hereinafter "Hewitt Index Fund Report"). *See also* Alameda County Employees' Retirement Association, minutes of April 12, 2017 Investment Committee Meeting, at 2 (recommending removal of BNY Mellon as passive index manager for the pension given its "declining [Assets Under Management] in an increasingly robust index management environment"), available at https://www.acera.org/sites/main/files/file-attachments/04122017_icm_minutes_final.pdf (last accessed Apr. 13, 2018).

passive assets under management in the particular asset class (i.e. domestic equity or domestic fixed income).[19]

61.     Taken together, in reviewing index fund managers, a prudent fiduciary will look at fees, tracking error, performance history, the manager's experience with the specific strategy and more broadly with indexing, the manager's assets under management with the particular strategy and more broadly within the asset class, and finally the firm's commitment to indexing as measured by the number of index fund strategies offered.[20]

62.     Given the competitiveness of the index fund marketplace, and the rapid evolution of the available products in terms of their features and the level of fees, investment managers of a multi-billion dollar portfolio of index fund holdings will closely monitor the cost and performance of the index funds in their portfolio, while regularly comparing that cost and performance to the fund's closest competitors, making changes when warranted based on the fees, tracking error, and institutional quality of other products in the marketplace.

## PRUDENT SELECTION OF INVESTMENT VEHICLES

63.     There are a number of different vehicles that pool the money of investors, and centrally manage that money according to a particular investment objective. Examples include mutual funds, exchange-traded funds, collective investment trusts, annuity separate accounts, or simply direct ownership of securities in a separate account structure.

64.     These vehicles may differ in terms of their legal structure, regulatory oversight, and product features. However, these vehicles may not differ in terms of their underlying

---

[19] Hewitt Index Fund Report at 4–5.
[20] *See* Hewitt Index Fund Report at 2–8; Mercer Index Fund Report at 2, 5–18; Wilshire Index Fund Report at 2, 5–8

investments. It is quite common for investment management companies to offer multiple versions of the same investment strategy in different vehicles. For example, BlackRock offers its S&P 500 index strategy as a mutual fund, annuity separate account, exchange traded fund, and collective investment trust, while Fidelity offers its Contrafund investment as a mutual fund, an annuity separate account, and a collective investment trust. These strategies typically invest in identical portfolios of investments, with the only differences being features such as fees and investment minimums that relate to the particular vehicle.

65.    In selecting investments, the manager of a fund-of-funds portfolio must choose not only which investment manager to hire for a particular portion of the portfolio, but also whether the chosen strategy is available in multiple vehicles, and which of those vehicles will best serve the interests of investors.

66.    Due to high asset minimums and exemption from regulations like the '40 Act, collective investment trust fund-of-fund managers typically have the widest array of choices available, subject to limitations imposed by the declaration of trust, allowing them to select other collective investment trusts, mutual funds, separately-managed accounts, annuity separate accounts, and exchange-traded funds.

67.    Given this flexibility, it is relatively uncommon for CIT fund-of-funds to own mutual funds. That is because the compliance requirements of the '40 Act generally result in mutual funds having the highest level of costs among the various vehicles. Furthermore, CIT managers are sufficiently sophisticated that they do not require '40 Act disclosures such as a prospectus or semiannual report of holdings. In addition, the mutual fund structure of an underlying fund confers no benefit upon investors in a fund-of-funds CIT, because such investors lack standing to enforce '40 Act provisions. *Amer. Chem. & Equip. Inc. 401(k) Retirement Plan*

*v. Principal Mgmt. Corp.*, 864 F.3d 859, 865 (8th Cir. 2017). In contrast, using CITs, annuity separate accounts, and separately-managed accounts as underlying funds offers significantly enhanced protections to both the fund-of-funds and its investors, because the managers of CITs, annuity separate accounts, and separately-managed accounts are all ERISA fiduciaries whenever the monies invested with them are from ERISA plans. Finally, features such as daily liquidity, daily valuation (sometimes referred to as "mark-to-market"), and holdings transparency can be provided by annuity separate accounts as well as collective investment trusts.[21]

68.    Because investment strategies from a particular manager are often available in different vehicles, a prudent manager of a fund-of-funds investment product will investigate the availability of different vehicles implementing the same strategy. And where those vehicles offer virtually identical investment portfolios, prudent managers of a fund-of-funds portfolio will use the vehicle that charges the lowest costs, as that vehicle will generally provide the best performance for investors in the fund-of-funds.

### PRUDENT INVESTIGATION, SELECTION AND MONITORING OF SHARE CLASSES

69.    Selecting the appropriate investment vehicle does not end the fund-of-fund manager's task. The manager must further select which share class of the investment vehicle to use.

70.    Mutual funds, annuity separate accounts, and collective investment trusts often offer multiple classes of shares of the same investment that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets. For

---

[21] *See* Coalition of Collective Investment Trusts, *Collective Investment Trusts White Paper* (Mar. 2015) at 8, 10.

example, the lowest cost share class of many index mutual funds and CITs have an investment minimum of several hundred million dollars. There is no difference between share classes other than the cost—the different share classes of a particular vehicle hold identical investments.

71.    Higher-cost share classes may make revenue sharing payments to cover administrative costs associated with offering the investment to thousands of participants in a defined contribution plan menu. However, fund-of-funds do not have such costs, as the fund itself is the only owner of shares, and thus incurs no such administrative costs in connection with a particular underlying investment. Therefore the only scenario in which it would be appropriate for a fund-of-funds to use a higher-cost share class of an underlying fund is if the increase in revenue sharing payments is *greater* than the fee differential between the share classes, AND the fund-of-funds manager refunded the entirety of those revenue sharing payments back to participants.

72.    A prudent retirement plan fiduciary managing a fund-of-funds will use its assets and negotiating power to use the cheapest share class available. The fiduciary will likewise pull its money from any investment manager that fails to make available the lowest-cost share class, if that share class is being made available to other investors with lower or similar amounts of assets. Finally, the prudent fund-of-funds manager engages in routine monitoring to determine whether a lower-cost share class of any of its investments has become available, and transfer to that lower-cost share class whenever it would be in the interest of participants.

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PRINCIPAL CITs

**I.    INVESTMENT STRUCTURE OF PRINCIPAL CITs**

73.    The Principal CITs are a series of target date fund collective investment trusts that were created in 2008 pursuant to the original Declaration of Trust, but began investment operations in July 2009.

74.    The operation of the Principal CITs is governed by the Declaration of Trust. Pursuant to the Declaration of Trust, Principal Trust operated as the trustee from the inception of the Principal CITs until the end of 2016. PGI Trust has operated as trustee of the Principal CITs since the beginning of 2017.

75.    The Principal CITs consist of twelve trusts. Eleven of the twelve have a specific target date ranging from 2010 to 2060. The twelfth Principal CIT is the "Income" fund for investors who have already reached their investment time horizon.

76.    Each of the Principal CITs is operated with all investors' assets pooled together. Each investor owns a certain number of units, with each unit representing a proportionate undivided interest in the Principal CIT. *See* Declaration of Trust § 1.2. The value of each unit is determined by the total market value of the assets held by the Principal CIT divided by the number of existing units. *Id.* §§ 4.1, 4.3.

77.    The Principal CITs have, since their inception, used a fund-of-funds investment structure in which the assets of the Principal CIT are invested in other pooled investment vehicles. Pursuant to the Declaration of Trust, each of the Principal CITs is permitted to invest in collective investment trusts, annuity separate accounts, mutual funds, or directly in securities. *Id.* § 3.1(a)–(h).

78.     The Declaration of Trust permits the trustee to hire an investment adviser "as a co-fiduciary" who "may but need not be an Affiliate of the Trustee." *Id.* § 3.3.

79.     Each Principal CIT is permitted, but not required, to invest in pooled investment products managed by Defendants and other Principal affiliates. *Id.* § 3.1(e)–(g).

80.     The Declaration of Trust provides that the fees shall be established by the Declaration of Trust Supplement for each fund, and that the trustee may reimburse itself from the trusts for operating expenses. *Id.* §§ 7.1, 7.2.

81.     From the launch of the Principal CITs until January 1, 2018, the Declaration of Trust Supplements have outlined four fee components for each of the Principal CITs. These four components are identified as the (1) service fee, (2) non-advisory trustee fee, (3) operating expenses, and (4) underlying investment expenses. The fee structure outlined in each Supplement is identical to the other Principal CITs, other than the name of the fund. The fee section contained within the supplement for the Principal LifeTime Hybrid 2020 CIT stated, for example, as follows:

**3.     Investment Classes and Fees:**

*Service Fee.* There are multiple share classes available under the Principal LifeTime Hybrid 2020 CIT. With the exception of the I Share Class, the Y Share Class and the Z Share Class, there is a Service Fee that varies depending on the share class selected by the Authorizing Fiduciary in the participation agreement between the Participating Trust and the Trustee. The Service Fee included in the share class selected by the Authorizing Fiduciary is identified on the attached Share Class Appendix.

*Non-Advisory Trustee Fee.* All share classes include a Non-Advisory Trustee Fee of four (4) basis points.

*Operating Expenses.* Operating Expenses may be paid from one or more Funds, as described in Sections 4.4 and Article VII of the Trust.

*Underlying Investment Expenses.* The fees and expenses described above are in addition to fees charged by underlying investments in the Principal LifeTime Hybrid 2020 CIT.

Declaration of Trust, Principal LifeTime Hybrid 2020 CIT Supplement.

82.    The non-advisory trustee fee, operating expenses, and underlying investment expenses are uniform for all investors in a particular Principal CIT.[22]  The service fee varies between 0 and 120 bps depending upon the share class selected by the participating plan. The service fee is paid to the participating plan or its trustee/recordkeeper to assist in the payment of administrative expenses related to operation of its plan.[23]

83.    The Principal CITs' fee structure allowed Defendants to increase their compensation at participants' expense by selecting proprietary investments and by selecting more expensive *versions* of those investments.

84.    This structure is not inherent to CITs operated using a fund-of-funds structure. Many trustees charge a fixed overall fee, then either use that fee to pay the fees associated with the underlying investment options, or invest the assets of the CIT in no-fee versions of underlying investments managed by affiliates.

85.    The Declaration of Trust codified the fiduciary duties owed by Defendants to investors, requiring the Trustee to "act in good faith and with the care and skills a prudent person would use in an enterprise of like character and with like aims." Declaration of Trust § 9.2. The Declaration of Trust further provides that the Principal CITs "are created for the exclusive benefit of the participants and beneficiaries of the Participating Trusts. No part of the corpus or income of a Fund . . . may be used for or diverted to any purposes other than for the exclusive benefit of the participants or their beneficiaries entitled to benefits . . . ." *Id.* § 2.4.

---

[22] The non-advisory trustee fee of 4 bps (.04%) is intended to cover the administrative costs of operating the Principal CITs, which includes all recordkeeping-related expenses.

[23] Participants in different share classes of a particular Principal CIT were still invested in identical underlying holdings, and thus, suffered in an identical manner from Defendants' imprudent and disloyal management of the Principal CITs' underlying investment options.

86.     The Principal CITs' investment process is described in their sales literature. *See* 2018 Brochure at 6; 2014 Brochure at 4. First, Defendants determined which asset classes would make up the CITs. Second, Defendants determined the percentage allocations to each asset class throughout the investor's investment lifespan, known as the glide path. Third, Defendants constructed each Principal CIT's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers." 2014 Brochure at 4. Defendants' fiduciary breaches in this case relate entirely to this third step—the selection and monitoring of the Principal CITs' underlying investment options.

87.     As part of this third step, "[t]he investment team identifies asset classes they believe will provide the greatest opportunities to outperform their corresponding indexes through active management. They also identify asset classes less likely to outperform their indexes, after fees are taken into account, and represent those through passively-managed investment portfolios." 2018 Brochure at 6.

88.     After performing this analysis, Defendants determined that four asset classes should be represented by index funds: large cap stocks would be represented by an index fund tracking the Standard & Poor's 500 Index; bonds would be represented by the Bloomberg Barclays Aggregate Bond Index; midcap stocks would be represented by the S&P Midcap 400 Index; and small cap stocks would be represented by the S&P SmallCap 600 Index. Accordingly, since their inception, the Principal CITs have used an index fund tracking each of these four indices as the sole vehicle for providing exposure to large cap stocks, bonds, mid cap stocks, and small cap stocks. And at all relevant times, the Principal CITs have all had between 60 and 70 percent of their total assets invested in these four index funds. Further, at all times during the

relevant period, all twelve of the Principal CITs have had assets invested in all four of these index funds.

89.    To represent the remaining asset classes, such as international stocks, high yield bonds, real estate, and inflation-linked bonds, Defendants used actively-managed investments affiliated with Principal. Throughout the relevant period, each Principal CIT has generally been made up of between 10 and 13 underlying investment options. These options have consisted of a mix of mutual fund, annuity separate account, and collective investment trust vehicles. Below is the asset allocation for all twelve Principal CITs as of March 31, 2017.

**Underlying Investment Options**

The estimated allocation of the Fund's assets in underlying investment options as of March 31, 2017 is shown in the table below.

**PRINCIPAL LIFETIME HYBRID CITS**

| Underlying Investment Option | Principal LifeTime Hybrid Income CIT | Principal LifeTime Hybrid 2010 CIT | Principal LifeTime Hybrid 2015 CIT | Principal LifeTime Hybrid 2020 CIT | Principal LifeTime Hybrid 2025 CIT | Principal LifeTime Hybrid 2030 CIT | Principal LifeTime Hybrid 2035 CIT | Principal LifeTime Hybrid 2040 CIT | Principal LifeTime Hybrid 2045 CIT | Principal LifeTime Hybrid 2050 CIT | Principal LifeTime Hybrid 2055 CIT | Principal LifeTime Hybrid 2060 CIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Sep. Acct. | 10.48% | 16.72% | 21.34% | 26.24% | 30.37% | 33.97% | 37.07% | 39.68% | 41.81% | 43.38% | 44.45% | 44.69% |
| S&P 400 Sep. Acct. | 2.95% | 4.78% | 6.23% | 7.40% | 8.69% | 9.42% | 10.43% | 11.08% | 11.63% | 12.14% | 12.38% | 12.52% |
| S&P 600 Sep. Acct. | 1.31% | 1.96% | 2.49% | 3.01% | 3.45% | 3.82% | 4.14% | 4.42% | 4.64% | 4.92% | 5.03% | 5.12% |
| Diversified International Fund | 5.52% | 9.06% | 10.99% | 13.63% | 15.83% | 17.13% | 17.73% | 18.84% | 19.76% | 20.93% | 21.22% | 21.42% |
| Intl. SmallCap Sep. Acct. | 0.85% | 1.36% | 1.70% | 1.94% | 2.27% | 2.45% | 2.63% | 2.76% | 2.89% | 2.98% | 3.03% | 3.05% |
| Intl. Emerging Markets Fund | ___ | ___ | ___ | ___ | ___ | 0.49% | 1.12% | 1.17% | 1.22% | 1.20% | 1.17% | 1.30% |
| Origin Emerging Markets Fund | ___ | ___ | ___ | ___ | ___ | 0.48% | 1.11% | 1.20% | 1.24% | 1.22% | 1.22% | 1.27% |
| Inflation Protection Fund | 7.64% | 6.13% | 4.74% | 3.46% | 2.55% | 1.98% | ___ | ___ | ___ | ___ | ___ | ___ |
| Bond Market Index Sep. Acct. | 40.41% | 32.59% | 31.25% | 28.28% | 25.87% | 21.48% | 18.04% | 13.50% | 10.30% | 6.71% | 4.98% | 4.05% |
| Diversified Real Asset CIT | ___ | 2.49% | 2.47% | 2.44% | 2.42% | 2.40% | 2.38% | 2.36% | 2.35% | 2.34% | 2.34% | 2.37% |
| Global Real Estate Securities Fund | ___ | ___ | ___ | 0.95% | 1.34% | 1.57% | 1.78% | 1.99% | 2.21% | 2.24% | 2.25% | 2.28% |
| High Yield I Fund | ___ | ___ | ___ | ___ | ___ | ___ | 3.57% | 2.99% | 1.94% | 1.93% | 1.93% | 1.93% |
| Global Diversified Income Fund | 9.69% | 8.95% | 7.84% | 6.76% | 5.70% | 4.43% | ___ | ___ | ___ | ___ | ___ | ___ |
| Short-Term Income Fund | 21.13% | 15.98% | 10.97% | 5.89% | 1.50% | 0.39% | ___ | ___ | ___ | ___ | ___ | ___ |

2017 Disclosure Document at 6.

90.    As of the end of 2016, approximately 9,000 retirement plans had participants invested in one or more of the Principal CITs. On information and belief, based upon applicable

Form 5500 documents, an affiliate of Defendants acted as the recordkeeper for all of these plans during the time in which they have been invested in the Principal CITs.

91.     Plaintiffs do not allege that the Principal CITs' fee structure itself constituted a breach of fiduciary duty, but instead allege that the fee structure provided an incentive for Defendants to make disloyal and imprudent investment decisions in their management of the assets of the Principal CITs. Plaintiffs also do not raise any allegations related to the asset allocation used by Defendants, or Defendants' decision to use passively- or actively-managed investments to represent particular asset classes. As described throughout this Complaint, Plaintiffs' allegations relate to the selection, monitoring, and retention of the underlying investments of the Principal CITs.

## II.    DEFENDANTS INVESTED THE ASSETS OF THE PRINCIPAL CITs IN HIGH COST, POOR PERFORMING PROPRIETARY INDEX FUNDS IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PARTICIPANTS

92.     As described above, throughout the relevant period, the Principal CITs had 60 to 70 percent of their assets—at all times over $1 billion—invested in index funds that tracked the S&P 500; the Bloomberg Barclays U.S. Aggregate Bond Index; the S&P Midcap 400; and the S&P Small Cap 600. Each of the Principal CITs were invested in all four of these index funds, with the average Principal CIT having approximately 30% of its assets in the large cap index fund, 20% of its assets in the bond index fund, 8% in the midcap index fund, and 4% in the small cap index fund.

93.     There are numerous investment managers in the marketplace, including BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard, that throughout the relevant period offered products tracking one or more of these same four indices with a high degree of precision, while charging very low fees. With over $1 billion in assets, Defendants had

sufficient size and bargaining power to qualify for the cheapest share class of any of these products.

94.    Defendants failed to investigate these marketplace alternatives, choosing instead to further their own self-interest by using proprietary index fund products from Principal to track all four indices. Defendants utilized Principal's index funds despite the fact that they charged fees that were 5 to 15 times higher than the fees charged by more competitive options.

95.    Defendants' conduct runs contrary to that of other fiduciaries that manage target date collective investment trusts.  The fiduciaries of target-date CITs managed by other financial services companies including (among others) AllianceBernstein, Charles Schwab, Great-West, and JPMorgan all used leading index fund CITs managed by BlackRock, BNY Mellon, Northern Trust, and State Street to provide passive large cap, mid cap, small cap, and fixed income exposure within their target-date funds.[24] This is despite the fact that AllianceBernstein, Charles Schwab, Great-West, JPMorgan and Voya all offered passively-managed investment products and services in the general marketplace. In contrast, not a single target-date fund in the marketplace (other than those affiliated with Principal) used index funds managed by Principal as underlying investment options.

96.    Not only were the Principal index funds more expensive, they were of significantly lower quality than the other options when it came to their sole function—tracking the underlying index. For the past decade or more, Principal's index funds have consistently had

---

[24] Fiduciaries of the Charles Schwab target date fund CITs also used an index mutual fund managed by Vanguard to provide exposure to mid-cap stocks during a portion of the relevant period. Other than this holding, the above-mentioned fiduciaries exclusively used CIT index fund products for passive exposure in their target-date fund CITs.

among the highest rates of tracking error among all index fund managers.[25] Furthermore, this tracking error has been consistently negative, meaning that Principal index funds are among the worst performing index funds in the entire marketplace even on a *pre-fee* basis.[26]

97.    Institutional factors also demonstrate the superiority of passive managers other than Principal. Vanguard, State Street, Northern Trust, and BlackRock have been managing index fund investments for over 40 years; each company manages over $300 billion in indexed assets (with BlackRock, State Street, and Vanguard managing over $1 trillion in passive investments); and each company offers over 100 different passive investment strategies.[27] By comparison, Principal manages under $50 billion in index fund assets, has only been managing index fund investments since the year 2000, and offers only five index fund strategies to its clients.

98.    To demonstrate Defendants' failure to prudently and loyally manage the Principal CITs' index fund investments, below is a performance chart covering the years 2010 through 2017 for the S&P 500 Index itself, the Principal Large Cap S&P 500 Index Fund used by

---

[25] Mercer Investment Consulting, *Manager Search Report to City of Los Angeles*, at 15–16, 30–31, 44, 60, 62 (Jan. 2015), available at http://per.lacity.org/deferredcomp/BR15-10ATTACHMENTCityOfLA-PassiveSearchesFinal.pdf (hereinafter "Mercer Index Fund Report"). Mercer's report limits its analysis to index mutual funds based upon language in the City of Los Angeles' Investment Policy Statement identifying mutual funds as the "recommended investment vehicle type" for each of the four asset classes analyzed. *Id.* at 2, 5, 19, 35, 47. As a result, the performance reported in the Mercer report for Principal's index mutual funds was lower than the actual investments used in the Principal CITs. The same was true for the mutual funds from BlackRock, State Street, Northern Trust, and BNY Mellon analyzed in the report, compared with the index fund CITs used by fiduciaries of target-date CITs. Furthermore, as the charts below demonstrate, the findings in the Mercer report also hold true when comparing the index funds used in the Principal CITs to marketplace competitors tracking the same indices.
[26] Mercer Index Fund Report at 12–13, 27–28, 32, 41, 46, 56, 62.
[27] Hewitt Index Fund Report at 2–5; Mercer Index Fund Report at 10, 25; BlackRock Index Fund Report at 27, 45.

Defendants, and several other S&P 500 index fund products used by the fiduciaries of other

target-date fund collective investment trusts, and the average over/under performance during

those years. Other columns show the average annual tracking error during the time period, and

the annual fee for each product as of December 31, 2017.

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Avg Over/Under Performance | Avg Tracking Error | Fee[28] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Index | 15.06 | 2.11 | 16.00 | 32.39 | 13.69 | 1.38 | 11.96 | 21.83 | | | n/a |
| Principal Large Cap S&P 500 Index Sep Acct-I5 | 14.98 -.08 | 2.07 -.04 | 15.92 -.08 | 32.23 -.16 | 13.52 -.17 | 1.33 -.05 | 11.88 -.08 | 21.72 -.11 | -.10%/yr | 9.6 bps | .06% |
| Blackrock Equity Index NL F | 15.10 +.04 | 2.12 +.01 | 16.04 +.04 | 32.35 -.04 | 13.68 -.01 | 1.38 0 | 11.97 +.01 | 21.83 0 | 0 | 1.9 bps | .01% |
| State Street S&P 500 Index NL – Cl A | 15.13 +.07 | 2.12 +.01 | 16.02 +.02 | 32.40 +.01 | 13.68 -.01 | 1.38 0 | 11.97 +.01 | 21.83 0 | +.01%/yr | 1.6 bps | .01% |
| Northern Trust S&P 500 Index Fund – NL – Tier J | 15.07 +.01 | 2.12 +.01 | 16.00 0 | 32.38 -.01 | 13.67 -.02 | 1.38 0 | 11.96 0 | 21.83 0 | 0 | 0.6 bps | .01% |
| Vanguard Institutional Index (VIIIX) | 15.07 +.01 | 2.12 +.01 | 16.00 0 | 32.37 -.02 | 13.68 -.01 | 1.39 +.01 | 11.95 -.01 | 21.82 -.01 | -.01%/yr | 1 bp | .02% |

99.    The chart shows that year after year, the Principal S&P 500 index option

significantly underperformed compared to both the benchmark index and index fund competitors

---

[28] As of December 31, 2017.

in the marketplace. The chart further shows that the Principal option had the highest level of tracking error during this eight-year period and the highest fees as of December 31, 2017. Had Defendants been monitoring the performance of the underlying investments in the Principal CITs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, there was ample evidence during every year of the relevant period that the Principal option should have been replaced with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed.

100.    The underperformance of Principal's S&P 500 index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P 500 index tracking. As of September 2014, Principal managed less than $20 billion of assets in S&P 500 index products, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $138 and $400 billion in products tracking the S&P 500.[29] These companies' dominance in the field of S&P 500 index tracking dates back to before the beginning of the relevant period and continues today.[30] Additionally, these four companies have all been managing S&P 500 index-tracking products since the late 1970s, while Principal did not launch an S&P 500 index-tracking strategy until 2000.[31] *Id.*

101.    Defendants' disloyal and imprudent index fund management was not limited to the S&P 500 index fund used by the Principal CITs. Defendants also used a proprietary Principal

---

[29] Mercer Index Fund Report at 25.
[30] Hewitt Index Fund Report at 4. Data from Morningstar shows that as of the end of 2017, Principal had $21 billion in S&P 500-tracking assets under management, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $148 and $645 billion.
[31] Mercer Index Fund Report at 25.

index fund that tracked the Bloomberg Barclays U.S. Aggregate Bond Index, despite the fund's

historical underperformance, and the availability of several marketplace alternatives that tracked

the *exact same index* with lower tracking error, better historical performance on a pre-fee basis,

and fees that were 10 to 15 times lower than the fees charged by Principal.

102.    Below is a performance chart covering the years 2010 through 2017 for the

Bloomberg Barclays U.S. Aggregate Bond Index itself, the Principal Bond Market Index Fund

used by Defendants, and several other index fund products that track the Bloomberg Barclays

U.S. Aggregate Bond Index that were used by the fiduciaries of other target-date fund collective

investment trusts. The chart also shows the average annual tracking error for each bond index

fund product as well as each product's annual fee as of December 31, 2017.

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Avg Over/Under Performance | Avg Tracking Error | Fee[32] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bloomberg Barclays U.S. Aggregate Bond Index | 6.54 | 7.84 | 4.21 | -2.02 | 5.97 | 0.55 | 2.65 | 3.54 | | | n/a |
| Principal Bond Index Sep Acct-Z | 6.00 -.54 | 7.57 -.27 | 3.89 -.32 | -2.45 -.43 | 5.80 -.17 | 0.32 -.23 | 2.34 -.31 | 3.28 -.26 | -.32%/yr | 31.6 bps | .15% |
| Blackrock U.S. Debt Index NL F | 6.55 +.01 | 7.81 -.03 | 4.23 +.02 | -2.02 0 | 6.12 +.15 | 0.57 +.02 | 2.67 +.02 | 3.60 +.06 | +.03%/yr | 3.9 bps | .01% |
| State Street U.S. Bond Index NL – Cl A | 6.59 +.05 | 7.83 -.01 | 4.18 -.03 | -2.05 -.03 | 6.00 +.03 | 0.61 +.06 | 2.62 -.03 | 3.52 0 | 0%/yr | 3 bps | .012% |
| Northern Trust Aggregate Bond Index Fund – NL – Tier J | 6.59 +.05 | 7.91 +.07 | 4.23 +.02 | -2.27 -.25 | 6.08 +.11 | 0.57 +.02 | 2.56 -.09 | 3.49 -.05 | -.01%/yr | 8.3 bps | .013% |

103.    The chart shows that year after year, the Principal bond index option significantly underperformed both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal option had the highest level of average tracking error during this eight-year period and the highest level of fees as of December 31, 2017. Had Defendants been monitoring the performance of the underlying investments in the Principal CITs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target-date fund CITs, they would have replaced the Principal bond index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above.

---

[32] As of December 31, 2017

104.    The underperformance of Principal's bond index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of passive fixed income management. BlackRock, Northern Trust, State Street, and Vanguard have all been managing passive fixed income assets for over twenty years, while Principal's bond index fund was launched less than 10 years ago.[33] And as of the end of 2017, Principal managed $3.5 billion in Bloomberg Barclays Aggregate Bond Index-tracking products (excluding monies invested by the Principal CITs), while Northern Trust, BlackRock, and State Street all managed between $31 and $76 billion in products tracking the same index.

105.    This self-serving use of proprietary index funds is underscored by Defendants' historical conduct in managing the Principal CITs' bond holdings. Prior to 2013, one of the Principal CITs' underlying holdings was a bond index CIT managed by BNY Mellon that charged a fee of 0.06% per year. In 2013, Defendants replaced the BNY Mellon bond index CIT with the Principal Bond Index fund, despite the fact that BNY Mellon managed both of these funds (acting as the advisor to its own product and the subadvisor to Principal's bond index product), and the Principal option charged fees that were 2-1/2 times higher than the BNY Mellon option. Given that the funds tracked the exact same index, and had the exact same managers, there does not appear to be any justification for this change other than to increase the fee revenue received by Defendants and their Principal affiliates and to increase the asset base of Principal's bond index fund, all directly at the expense of participant investors.

106.    Defendants' use of a proprietary index fund product to track the S&P Midcap 400 Index was similarly disloyal and imprudent. Again, throughout the relevant period, Defendants

---

[33] Hewitt Index Fund Report at 5; Mercer Index Fund Report at 10.

used a proprietary Principal index fund to track the S&P Midcap 400, despite the availability of marketplace options with superior long-term performance on a pre-fee basis, lower tracking error, and lower fees.  Below is a chart showing the annual performance from 2010 to 2017 of the S&P Midcap 400 Index itself, the Principal MidCap S&P 400 Index Fund used by Defendants in the Principal CITs, and several other index fund CITs that track the S&P Midcap 400 Index and were used by the fiduciaries of other target-date fund collective investment trusts. The chart also shows the average tracking error of each product during this period as well as each product's annual fee as of December 31, 2017.

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Avg Over/Under Performance | Tracking Error | Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|
| S&P MidCap 400 Index | 26.64 | -1.73 | 17.88 | 33.50 | 9.77 | -2.18 | 20.74 | 16.24 | | | n/a |
| Principal MidCap S&P 400 Index Sep Acct-I5 | 26.45 -.19 | -1.79 -.06 | 17.76 -.12 | 33.32 -.18 | 9.65 -.12 | -2.25 -.07 | 20.59 -.15 | 16.14 -.10 | -.13%/yr | 12.4 bps | .06% |
| Blackrock Mid-Cap Equity Index NL F | 26.54 -.10 | -1.80 -.07 | 17.85 -.03 | 33.49 -.01 | 9.74 -.03 | -2.16 +.02 | 20.70 -.04 | 16.20 -.04 | -.04%/yr | 4.3 bps | .02% |
| State Street S&P MidCap Index NL – Cl A | 26.61 -.03 | -1.72 +.01 | 17.92 +.04 | 33.48 -.02 | 9.77 0 | -2.20 -.02 | 20.71 -.03 | 16.25 +.01 | -.01%/yr | 2 bps | .02% |
| Northern Trust S&P MidCap 400 Index Fund – NL – Tier J | 26.55 -.09 | -1.86 -.13 | 17.77 -.11 | 33.36 -.14 | 9.72 -.05 | -2.17 +.01 | 20.70 -.04 | 16.17 -.07 | -.08%/yr | 8 bps | .02% |

107.    The chart shows that year after year, the Principal midcap index option significantly underperformed both its benchmark index and index fund competitors in the

marketplace. The chart further shows that the Principal option had the highest level of tracking error as well as the highest fees among these options. Had Defendants been monitoring the performance of the underlying investments in the Principal CITs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target date fund CITs, they would have replaced the Principal mid-cap index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above.

108.    The underperformance of Principal's mid cap index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P Midcap 400 index tracking. BlackRock, Northern Trust, and State Street all had several years more experience with mid cap indexing than Principal. According to data from Morningstar, as of the end of 2017, Principal managed $3.5 billion in assets tracking the S&P MidCap 400 Index (excluding monies invested by the Principal CITs), while Northern Trust, BlackRock, and State Street all managed between $5 and $22 billion in products tracking the same index.[34]

109.    Defendants' use of the Principal proprietary small cap index product was similarly imprudent. While few investment managers offer a product that tracks the S&P SmallCap 600 Index, Vanguard began offering such a mutual fund in 2010, and as the chart below shows, it would have been a superior option for participants.

---

[34] BlackRock and State Street in particular stand out as having achieved superior economies of scale to Principal. As of the end of 2017, according to data from Morningstar, Northern Trust managed $5 billion in assets tracking the S&P MidCap 400 Index, while both BlackRock and State Street managed over $15 billion in assets tracking this index.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Avg Over/Under Performance | Avg Tracking Error | Annual Fee[35] |
|---|---|---|---|---|---|---|---|---|---|---|
| S&P SmallCap 600 Index | 1.02 | 16.33 | 41.31 | 5.76 | -1.97 | 26.56 | 13.23 | n/a | n/a | n/a |
| Principal SmallCap S&P 600 Index Sep Acct-I5 | 0.80 -.22 | 16.24 -.09 | 41.07 -.24 | 5.74 -.02 | -2.10 -.13 | 26.44 -.12 | 13.25 +.02 | -.11%/yr | 10.5 bps | .06% |
| Vanguard S&P Small-Cap 600 Index (VSMSX) | 0.81 -.07 | 16.26 -.07 | 41.18 -.13 | 5.69 -.07 | -2.00 -.03 | 26.52 -.04 | 13.37 +.14 | -.05%/yr | 6.9 bps | .08% |

110.    The chart shows that year after year, the Principal small cap index option significantly underperformed the Vanguard index fund competitor. The chart further shows that the Principal option had higher tracking error, and that the tracking error was chronically negative. Institutional factors also favored Vanguard, given its experience and expertise in index tracking, and given that Vanguard managed at least twenty times more small-cap-index tracking assets as of the end of 2017. Had Defendants been monitoring the performance of the underlying investments in the Principal CITs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, they would have replaced the Principal small cap index option with the corresponding Vanguard option.

111.    The fact that Principal's index fund options were annuity separate accounts while the marketplace alternatives were collective investment trusts or mutual funds is not a material distinction. Though the legal structure of the Principal index funds is that of an annuity separate account, the investments themselves did not offer any actual insurance-like features. Defendants

---

[35] As of December 31, 2017.

used an annuity separate account vehicle because that happens to be the index fund vehicle that Principal offers in the marketplace, not because use of that vehicle conferred any benefit upon Principal CIT participants compared with using an index fund operated as a collective investment trust or mutual fund. This is demonstrated by the fact that Defendants also used proprietary collective investment trust and mutual fund vehicles as holdings within the Principal CITs.

112.    Defendants benefited in multiple ways from the use of proprietary index funds within the Principal CITs. In addition to the fees earned by Defendants, Principal CIT assets help subsidize the operating costs of Principal's index funds, making them more profitable to Principal. The impact on Principal's business interests has been substantial: more than half of the assets in Principal's large cap, mid cap, small cap, and bond index funds come from the Principal CITs.

## III.    DEFENDANTS INVESTED PRINCIPAL CIT ASSETS IN MORE EXPENSIVE VEHICLES AND SHARE CLASSES DESPITE AVAILABILITY OF IDENTICAL LOWER-COST OPTIONS

113.    Defendants also breached their fiduciary duties by utilizing more expensive versions of Principal-affiliated underlying investments, despite the availability of identical, but lower cost, investment vehicles and share classes. This failure directly resulted in higher investment fees earned by Defendants and their affiliates at the expense of participants who paid higher fees and experienced worse performance.

114.    As described *supra* at 63–72, for every investment used by a collective investment trust using a fund-of-funds structure, a prudent fiduciary will investigate whether the trust can use its size and negotiating power to qualify for otherwise identical lower-cost investment vehicles and share classes.

45

115. Defendants failed to investigate and utilize lower-cost vehicles, in several instances using Principal-affiliated mutual funds as investments within the Principal CITs despite the availability of lower-cost, but otherwise identical, annuity separate accounts managed by Principal.

116. Defendants cannot argue there was a qualitative difference between the two vehicles. Defendants' own sales literature represents that they act as an ERISA fiduciary in their management of annuity separate accounts, that "[s]ubstantial resources have gone into the careful review and ongoing monitoring" of their annuity separate accounts, and that Principal's annuity separate accounts constitute appropriate investments for an ERISA fiduciary. Principal Investment Fiduciary Support Services Brochure at 3.[36]

117. For example, at all relevant times, the Principal CITs have used the mutual fund version of the Principal Diversified International Fund. Since 2015, the mutual fund version of this fund used by the Principal CITs charged annual fees of 0.85%.[37] But Principal offers an identical version of this investment as an annuity separate account, the lowest-cost share class of which charges only 0.39% per year, less than half than what the mutual fund charged.[38]

---

[36] Investment Fiduciary Support Services Terms & Conditions at 3 (June 2017), available at https://secure02.principal.com/publicvsupply/GetFile?fm=pq10986&ty=VOP&EXT=.VOP (last accessed Mar. 6, 2018).

[37] *See* Principal LifeTime Hybrid 2030 CIT Z Fact Sheet, at 2 (Dec. 31, 2017), available at https://secure05.principal.com/document-download/api/v1/public/document?format=VOP&itemId=FS1T3097 (last accessed Feb. 1, 2018); Principal LifeTime Hybrid 2030 CIT Z Fact Sheet, at p. 57 (Dec. 31, 2015), available at https://app.lla.state.la.us/PublicReports.nsf/27C0F6BA346FFCFA86257FDF00691341/$FILE/0000FB71.pdf (last accessed Mar. 12, 2018).

[38] Principal LifeTime Hybrid 2030 CIT Z Fact Sheet, at p. 95 (Dec. 31, 2015), available at https://app.lla.state.la.us/PublicReports.nsf/27C0F6BA346FFCFA86257FDF00691341/$FILE/0000FB71.pdf (last accessed Mar. 12, 2018).

118. Hundreds of plans—including, for example, the plan for Principal's own employees, the $15 million Southside Bancshares plan, and the $25 million Louisiana Lottery plan—use Z shares of the Diversified International annuity separate account. None of these plans had as much money invested in the fund as the Principal CITs. Therefore had Defendants used their leverage and negotiating power, the Principal CITs could have utilized Z shares of the Diversified International annuity separate account.

119. Below is a chart for 2010 to 2016 (the years for which Plaintiffs have data) comparing the performance of the Principal Diversified International mutual fund used by the Principal CITs with Z shares of the Principal Diversified International annuity separate account. It demonstrates that not only not only did the annuity separate account have lower fees, but also had consistently superior performance *on a pre-fee basis*.

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Avg Annual Performance | Annual Fee[39] |
|---|---|---|---|---|---|---|---|---|---|
| Diversified International Annuity Separate Account – Z shares | 14.84 | -10.53 | 19.21 | 19.44 | -2.45 | 0.21 | 0.97 | 5.95% | .39% |
| Diversified International Mutual Fund – I shares | 13.43 -1.41 | -11.18 -.65 | 18.19 -1.02 | 18.73 -.71 | -3.02 -.57 | -0.36 -.57 | 0.26 -.71 | 5.15% -.80%/yr | .85% .46% higher |

120. This was not the only instance in which Defendants used higher-cost investments despite the availability of identical, lower-cost vehicles. Several of the Principal CITs used the Principal International Emerging Markets mutual fund, which as of the end of 2016 charged expenses of 1.21% per year. Defendants used this investment despite the availability of Z shares

---

[39] As of December 31, 2016.

of an identical annuity separate account that charged fees that were at least 0.50% lower than the mutual fund, and would have outperformed the mutual fund by a comparable or greater amount.

121.    Defendants also used higher-cost, lower-performing mutual fund vehicles for the Short-Term Income, Global Diversified Income, and Inflation Protected Securities investments despite the availability of lower-cost but otherwise identical annuity separate account options.

122.    These decisions not only resulted in Defendants and their affiliates earning higher fees, they also benefitted Principal's mutual fund business, by helping to subsidize the costs of complying with the Investment Company Act of 1940, and providing superior economies of scale. For example, according to Principal Funds' Statement of Additional Information, as of February 6, 2018, 55% of the assets of the Principal Diversified International mutual fund were invested in the Principal CITs.[40] Assets from the Principal CITs made the Principal Diversified International mutual fund and other Principal mutual funds more profitable to Defendants and their affiliates.

123.    Defendants also failed to investigate and utilize the lowest-cost share class of many of the investments held by the Principal CITs. As discussed *supra* at 69–72, prudent fiduciaries will use their size and negotiating power to qualify for the lowest-cost available share class of an investment vehicle. The lowest-cost share class for Principal's annuity separate account investments is Z shares, and the lowest-cost share class of Principal's mutual funds are R6 shares. Yet Defendants consistently used the I5 share class for annuity separate accounts and Institutional shares for the mutual funds held by the Principal CITs. For example, Defendants

---

[40] Principal Funds 2018 Statement of Additional Information at 101 (Mar. 1, 2018), available at https://www.sec.gov/Archives/edgar/data/898745/000089874518000175/pfi1031485b2018doc.htm#s5C19766E51D9EDADAD27C28AF01CFC33 (last accessed Apr. 13, 2018).

utilized Institutional shares of the Principal High Yield mutual fund, with annual expenses of 0.61%, despite the availability of R6 shares, which cost only 0.53% per year. Similarly, Principal used I5 shares of the large cap, mid cap, and small cap index fund annuity separate accounts, despite the I5 shares charging fees that were materially higher than the fees charged by otherwise-identical Z shares.

124.    Investing in these more expensive vehicles or share classes did not confer any benefit upon participants investing in the Principal CITs. There were no revenue sharing payments that were credited to participants, and though some participating plans were paid service fee credits, these amounts were nominal, and ultimately flowed to the benefit of Defendants and their affiliates, as these fee credits were used to pay recordkeeping fees to Principal.

125.    Plaintiffs did not have knowledge of all material facts (including, among other things, availability of less expensive and better performing alternative investments, the availability of lower-cost investment vehicles and share classes, the relatively greater experience, expertise, and asset base of Principal's competitors in the index fund marketplace, and the investment performance of underlying Principal CIT investments versus other specific alternatives) necessary to understand that Defendants breached their fiduciary duties in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the selection and monitoring of investment options within the Principal CITs (including Defendants' processes and motivations for selecting, monitoring, evaluating, and removing investments), because this information is solely within Defendants' possession prior to discovery. For purposes

of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth in this Complaint.

## CLASS ACTION ALLEGATIONS

126.    29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action to obtain the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

127.    Plaintiffs assert their claim in Counts I on behalf of a class of participants and beneficiaries defined as follows:[41]

> All participants and beneficiaries of an employee benefit plan qualified under Section 401(a) of the Internal Revenue Code invested in any of the Principal LifeTime Hybrid Collective Investment Funds at any time on or after April 16, 2012, excluding participants and beneficiaries in governmental plans, as defined by Section 414(d) of the Code.

128.    Numerosity:    The Class is so numerous that joinder of all Class members is impracticable. As of the end of 2016, over 9,000 retirement plans had one or more participants invested in the Principal CITs. Plaintiffs do not currently know the number of participants that have invested in the Principal CITs during the relevant period, but believe it is in the hundreds of thousands.

129.    Typicality:    Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs invested in the Principal CITs and suffered injuries as a result of the mismanagement of those CITs by Defendants. Defendants managed the assets of each Principal CIT collectively, and all twelve of the Principal CITs had between 60 and 70 percent of

---

[41] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

their assets invested in the same four Principal-affiliated large cap, mid cap, small cap, and bond index funds. Similarly, all twelve of the Principal CITs utilized underlying investment vehicles and share classes that were more expensive than identical versions of the same investments. Defendants' imprudent and disloyal decisions affected all Class members similarly.

130.    <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

131.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

  a.  Whether Defendants are fiduciaries of the Principal CITs;

  b.  Whether Defendants' fiduciary duties included prudent and loyal management of the underlying investment options held by the Principal CITs;

  c.  Whether Defendants breached their fiduciary duties by investing the assets of the Principal CITs in Principal-affiliated large cap, mid cap, small cap, and bond index funds;

  d.  Whether Defendants breached their fiduciary duties by investing in mutual fund versions of actively-managed Principal investments despite the availability of lower-cost but otherwise identical annuity separate account versions of those investments;

  e.  Whether Defendants breached their fiduciary duties by failing to leverage the size and negotiating power of the Principal CITs to procure the lowest-cost share class of each of the underlying investments of the Principal CITs;

      f.   Whether Defendants are additionally or alternatively liable, as co-fiduciaries, for the unlawful conduct described herein pursuant to 29 U.S.C. § 1105;

      g.   The proper form of equitable and injunctive relief;

      h.   The proper measure of monetary relief.

132.   Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

133.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court—such as removal of particular investments within the Principal CITs or removal of any or all of the fiduciaries of the Principal CITs—would be dispositive of non-party participants' interests. The accounting and restoration of participants' plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

134.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's

individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B), (D)**

135.    Defendants PGI Trust, Principal Trust, PGI, and PMC are or were fiduciaries of the Principal CITs, as defined by 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

136.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their management of the investments held by the Principal CITs.

137.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Principal CITs for the sole and exclusive benefit of participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for prudently and loyally selecting appropriate investment options, evaluating and monitoring the Principal CITs' investments on an ongoing basis and removing and replacing those that are no longer appropriate, and taking all necessary steps to ensure that the Plan's assets are invested prudently and in a low-cost manner. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

138.    As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the underlying investments held by the Principal CITs. Defendants imprudently and disloyally retained higher-cost, poor-performing Principal-affiliated index fund options despite the availability of *identical* index fund products offered by unaffiliated managers with demonstrably superior ability to track the subject index for fees that were 5 to 15 times lower than those charged by the Principal-affiliated options. Defendants also used higher-cost investment vehicles and share classes of Principal-affiliated investments despite the availability of identical investments that charged lower fees, and would have performed better.

139.    Each of the above-mentioned actions and failures to act described in paragraph 138 and throughout the Complaint demonstrate Defendants' failure to make investment decisions based solely on the merits of each investment and what was in the best interests of participants invested in the Principal CITs. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Defendants, Principal Financial Group, Inc., and its affiliates. Through these actions and omissions, Defendants failed to discharge their fiduciary duties solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

140.    Each of the above actions and omissions described in paragraph 138 and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an

enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

141.    The fiduciary duties outlined by 29 U.S.C. § 1104(a)(1)(A) and (B) were codified as duties of the trustee within the Declaration of Trust. Declaration of Trust §§ 2.4, 9.2. Defendants made similar representations in the participation agreements they entered into with participating plans. Therefore, Defendants' failure to manage the Principal CITs for the exclusive purpose of providing benefits to participants and their beneficiaries and with the care, skill, prudence and diligence that a fiduciary acting in like capacity would have used also constitutes a failure to manage the Principal CITs "in accordance with the documents and instruments governing the plan" in violation of 29 U.S.C. § 1104(a)(1)(D).

142.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good the losses resulting from the aforementioned breaches, to restore any profits Defendants made through the use of ERISA plan assets, and to disgorge any profits earned as a result of the fiduciary breaches alleged in this Count.

143.    Each Defendant knowingly participated in the breach of one or more of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Nelsen, Jasmin, and Williams, individually and as representatives of the Class defined herein, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good all losses resulting from the breaches of fiduciary duties described above;

E.    An accounting for profits earned by Defendants and a subsequent order requiring Defendants to disgorge all profits earned from, or in respect of, Defendants' breaches of fiduciary duties related to the Principal CITs during the relevant period;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all ERISA plan assets transferred to Defendants as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Defendants to prevent their unjust enrichment from unlawful transactions involving the assets of the Principal CITs;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J.    An award of such other and further relief as the Court deems equitable and just.

Dated: April 16, 2018        **NEWKIRK ZWAGERMAN LAW FIRM, P.L.C.**

By: /s/ Jill Zwagerman
Jill Zwagerman (IA # AT0000324)
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
jzwagerman@newkirklaw.com

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Carl F. Engstrom, MN Bar No. 0396298*
Brandon T. McDonough, MN Bar No. 0393259*
        * *pro hac vice* application forthcoming
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
lukas@nka.com
cengstrom@nka.com
bmcdonough@nka.com

ATTORNEYS FOR PLAINTIFFS